UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

RICHARD R. LOPEZ,

               Plaintiff,

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL
SECURITY,

              Defendant.

           )
           )
           )
           )
           )
           )
           )
           )
           )
           )
           )
           )

1:08-cv-01542-SMS

DECISION AND ORDER DENYING
PLAINTIFF'S SOCIAL SECURITY
COMPLAINT (DOC. 1)

ORDER DIRECTING THE ENTRY OF
JUDGMENT FOR DEFENDANT MICHAEL J.
ASTRUE, COMMISSIONER OF SOCIAL
SECURITY, AND AGAINST PLAINTIFF
RICHARD R. LOPEZ

Plaintiff is proceeding with counsel with an action seeking judicial review of a final decision of the Commissioner of Social Security (Commissioner) denying Plaintiff's applications of July 26, 2000, May 27, 2003, and July 14, 2000 (A.R. 153-55, 158-60, 3), made pursuant to Titles II and XVI of the Social Security Act for disability insurance benefits (DIB) and supplemental security income (SSI), in which Plaintiff alleged that he had been disabled since September 15, 1999, due to intermittent pain in the lower back, hip, and knee brought on by moving around and resulting in an inability to walk very well (A.R. 153-55, 194, 197, 3). The Court has subject matter jurisdiction pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g). The parties have consented to

the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c)(1), and pursuant to the order of Judge Lawrence J. O'Neill filed on February 10, 2009, the matter has been assigned to the Magistrate Judge to conduct all further proceedings in this case, including entry of final judgment.

The decision under review is that of Social Security Administration (SSA) Administrative Law Judge (ALJ) David E. Flierl, dated September 26, 2007 (A.R. 18-25), rendered after a hearing held on August 7, 2007 (A.R. 53-84), at which Plaintiff appeared and testified after choosing to do so without the assistance of an attorney or other representative (A.R. 18).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision on March 21, 2008 (A.R. 7-9), and thereafter Plaintiff filed the complaint in this Court on October 14, 2008. Plaintiff's opening brief was filed on August 26, 2009; Defendant filed a brief on September 17, 2009; and Plaintiff filed a reply brief on September 28, 2009. The matter has been submitted without oral argument to the Magistrate Judge.

I. Standard and Scope of Review

A. Legal Standards

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence means "more than a mere scintilla," Richardson v. Perales, 402 U.S. 389, 402 (1971), but less than a preponderance, Sorenson v. Weinberger, 514 F.2d 1112, 1119, n. 10

(9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401. The Court must consider the record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion; it may not simply isolate a portion of evidence that supports the decision. Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985). It is immaterial that the evidence would support a finding contrary to that reached by the Commissioner; the determination of the Commissioner as to a factual matter will stand if supported by substantial evidence because it is the Commissioner's job, and not the Court's, to resolve conflicts in the evidence. Sorenson v. Weinberger, 514 F.2d 1112, 1119 (9th Cir. 1975).

In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must review the whole record and uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See, Sanchez v. Secretary of Health and Human Services, 812 F.2d 509, 510 (9th Cir. 1987); Jones v. Heckler, 760 F.2d at 995. If the Court concludes that the ALJ did not use the proper legal standard, the matter will be remanded to permit application of the appropriate standard. Cooper v. Bowen, 885 F.2d 557, 561 (9th Cir. 1987).

3

B. <u>The Scope of the Remand from the Appeals Council</u>

As a result of prior proceedings on the application that is the basis for the instant proceeding, the pertinent period for a determination of disability by the ALJ in the decision before this Court was from Plaintiff's originally alleged date of onset, September 15, 1999, until January 1, 2006, the date on which the previous ALJ, with the later acquiescence of the Appeals Council, had already determined that Plaintiff became disabled.

The pertinent orders reflect this limited scope of adjudication. On May 16, 2006, in a decision made on Plaintiff's application, the other ALJ found that Plaintiff was disabled beginning on January 1, 2006, and the Appeals Council affirmed this finding on December 11, 2006. (A.R. 26-28.)

However, in the same document affirming the previous ALJ's finding of disability beginning in January 2006, the Appeals Council granted review of other parts of the ALJ's decision. Review was granted because Plaintiff established that his attorney representative had misled him concerning the law and/or facts pertinent to Plaintiff's date of onset and Plaintiff's last date of meeting disability earnings requirements for purposes of entitlement to DIB. Plaintiff had mistakenly amended his alleged date of onset, which had originally been September 15, 1999, to January 1, 2006; however, the record had shown that Plaintiff last met the disability earnings requirements for entitlement to DIB on September 30, 2003. Therefore, the result of Plaintiff's amending the onset date to January 2006 was to lose his benefits because the amended date of onset postdated Plaintiff's date last insured. (A.R. 27-28.)

1   The Appeals Council remanded the case to an ALJ for a
2  hearing to permit Plaintiff to choose an alleged onset date and
3  fully to present his case based on that onset date. The Appeals
4  Council also specified that the ALJ was to consider the entire
5  record and provide assessment regarding the medical impairments
6  established by the medical evidence, which included certain
7  impairments that had not been discussed or evaluated in the
8  previous ALJ's decision (i.e., depression, alcoholism, and
9  obesity); provide discussion and rationale for the conclusions
10 reached regarding the specific limitations resulting from
11 Plaintiff's impairments for the portion of the period at issue
12 prior to January 1, 2006, and for the weight accorded to the
13 medical opinions of record; address appropriately the credibility
14 of Plaintiff's subjective complaints; and, as appropriate, obtain
15 supplemental evidence from a vocational expert to clarify the
16 effect of the assessed limitations on the occupational base.
17 (A.R. 28.)

18   III. <u>Disability</u>

19      A. <u>Legal Standards</u>

20   In order to qualify for benefits, a claimant must establish
21 that she is unable to engage in substantial gainful activity due
22 to a medically determinable physical or mental impairment which
23 has lasted or can be expected to last for a continuous period of
24 not less than twelve months. 42 U.S.C. §§ 416(i), 1382c(a)(3)(A).
25 A claimant must demonstrate a physical or mental impairment of
26 such severity that the claimant is not only unable to do the
27 claimant's previous work, but cannot, considering age, education,
28 and work experience, engage in any other kind of substantial

gainful work which exists in the national economy. 42 U.S.C. 1382c(a)(3)(B); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden of establishing a disability is initially on the claimant, who must prove that the claimant is unable to return to his or her former type of work; the burden then shifts to the Commissioner to identify other jobs that the claimant is capable of performing considering the claimant's residual functional capacity, as well as his or her age, education and last fifteen years of work experience. Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The regulations provide that the ALJ must make specific sequential determinations in the process of evaluating a disability: 1) whether the applicant engaged in substantial gainful activity since the alleged date of the onset of the impairment, 20 C.F.R. § 404.1520;[1] 2) whether solely on the basis of the medical evidence the claimed impairment is severe, that is, of a magnitude sufficient to limit significantly the individual's physical or mental ability to do basic work activities, 20 C.F.R. § 404.1520(c); 3) whether solely on the basis of medical evidence the impairment equals or exceeds in severity certain impairments described in Appendix I of the regulations, 20 C.F.R. § 404.1520(d); 4) whether the applicant has sufficient residual functional capacity, defined as what an individual can still do despite limitations, to perform the applicant's past work, 20 C.F.R. §§ 404.1520(e), 404.1545(a); and 5) whether on the basis of the applicant's age, education, work

---

[1] All references are to the 2008 version of the Code of Federal Regulations unless otherwise noted.

experience, and residual functional capacity, the applicant can perform any other gainful and substantial work within the economy, 20 C.F.R. § 404.1520(f).

With respect to SSI, the five-step evaluation process is essentially the same. <u>See</u>, 20 C.F.R. § 416.920.

B. <u>The ALJ's Findings</u>

The ALJ found that on the alleged date of onset, September 15, 1999, Plaintiff did not have a medically determinable severe impairment, but by September 30, 2003 (the date last insured), Plaintiff had a severe impairment of degenerative disc disease of the lumbar spine; his depressive symptoms and alcohol dependency were not severe. (A.R. 20-21.) Plaintiff had no impairment or combination thereof that met or medically equaled a listed impairment. (A.R. 21.)

The ALJ found that from September 2003 through December 31, 2005 (i.e., the last day before January 1, 2006), Plaintiff retained the residual functional capacity (RFC) to perform limited light work, occasionally lift up to twenty pounds, frequently lift and carry up to ten pounds, sit, stand, or walk for six hours in an eight-hour day with the usual breaks, and only occasionally stoop and crouch. (A.R. 21.)

The ALJ found that after January 1, 2006, Plaintiff had the RFC occasionally to lift up to twenty pounds, frequently lift and carry up to ten pounds, with no lifting from below waist level; sit, stand, or walk for six hours, but was precluded from climbing, bending, kneeling, crouching, and crawling, which vocational testimony established was equivalent to sedentary exertion. (A.R. 21.) Plaintiff could not perform any past

7

relevant work, but after considering Plaintiff's age, high school education, ability to communicate in English, work experience, and RFC, the ALJ found that from September 2003 through January 1, 2006, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform. (A.R. 23-24.) Accordingly, Plaintiff was not disabled at any time from September 15, 1999, through January 1, 2006, but became disabled on January 1, 2006, and has continued to be disabled through the date of decision. (A.R. 24.)

C. <u>Plaintiff's Contentions</u>

Plaintiff's sole contention that is expressly labeled as such in this proceeding is that the ALJ violated Social Security Ruling 83-20 and the law as established in this circuit by failing to obtain expert testimony to determine the date of onset of Plaintiff's disability. (Brief pp. 7-8.)

However, in the course of argument under that heading, Plaintiff challenges the ALJ's findings in light of the evidence in several respects. For example, Plaintiff contends that if the provision of a TENS unit to Plaintiff was dispositive, then the ALJ should have found disability in December 2005, when Dr. Santiago prescribed it for electro-stimulation; if use of a cane was critical, then the ALJ should have picked an earlier date because the record shows that Plaintiff used a cane on October 12, 2004, and for five or six years before 2005. (Brief p. 8.) Some of Plaintiff's arguments rest on a premise that the ALJ's reasoning was erroneous as a matter of law. Plaintiff also argues that the ALJ failed to state specific, legitimate reasons for rejecting the only inferences flowing from Dr. Santiago's opinion

8

concerning Plaintiff's functionality in 2006, and thus the ALJ's conclusion concerning Plaintiff's RFC lacked the support of substantial evidence. (Brief p. 9.) These constitute challenges to the legal correctness and evidentiary support of the ALJ's findings concerning Plaintiff's RFC.

The Court will address all Plaintiff's arguments. Although proceedings in this Court are adversary proceedings, the Court notes that the administrative proceedings being reviewed are essentially investigatory in nature. See, Sims v. Apfel, 530 U.S. 103, 110-11 (2000). Plaintiff has already suffered delay due to an administrative remand and problems with counsel, and he proceeded without counsel below. Defendant's careful briefing responds with analysis of the law and evidence pertinent to all the arguments raised by Plaintiff. In view of the foregoing, and in the interest of providing adequate review, the Court will liberally construe counsel's statement of arguments in the opening brief and will not engage in any strict waiver analysis in this case.

IV. Medical Evidence

Records from Kevin D. Meeks, D.C., from 1997 through 1999 reveal frequent examination and ultrasound treatment. (A.R. 512-15.) Notes from 1999 reflect that Plaintiff complained of pain in the lower back on standing and sitting, and he displayed antalgic posture. (A.R. 501.) Plaintiff attended physical therapy five times in May 1999, and treatment notes reflect that Plaintiff reported that he slept better and had less pain, although he experienced hip pain with walking. (A.R. 502-03.)

Treatment notes from February 2000 show that Plaintiff

reported that he was a truck driver who had not worked for the past few months. Notes show that dorso-lumber range of motion was normal except for extension; Romberg and Babinski were negative. The diagnosis was moderate to severe lumbar degenerative joint disease and intermittent nerve impingement. (A.R. 515-17.)

On April 13, 2000, Hagop Tookoian, M.D., reported that an x-ray of the lumbosacral spine revealed rotoscoliosis of the visualized spine with convexity to the left, and the remainder of the visualized osseous parts were unremarkable. (A.R. 531, 226.)

Records from the Department of Veterans Affairs from June 2000 show that Plaintiff, who was taking Naproxen and a capsaicin cream, reported that the pain was better but worsened with walking and moving around and lessened with sitting and relaxing. He reported no tingling, numbness, or weakness in the legs. The assessment was lumbosacral sprain, and back school was planned. (A.R. 229-30.) In August 2000, a note reflected that Plaintiff had twice been sent papers to set up back school, but he did not respond to either letter. (A.R. 228.)

On October 7, 2003, Jonathan M. Gurdin, M.D., an orthopedic specialist, performed an orthopedic evaluation of Plaintiff (A.R. 243-45), who complained of intermittent pain in both knees once or twice a week with prolonged walking or standing, but without locking, swelling, or collapsing, treated with a steroid injection, periodic use of a cane, Naprosyn from his sister, and soaking frequently in the YMCA's Jacuzzi. It limited his walking to five or six blocks, and standing to one hour at a time; he could lift twenty-five or thirty pounds. Sitting in a chair with a back rest was not restricted; he avoided climbing stairs. (A.R.

10

243.)

Plaintiff also complained of intermittent daily pain in the lumbar area brought on by awkward positions, bending, lifting, twisting, and prolonged walking, standing, and sitting; further, his back sometimes went out with muscle spasms. Plaintiff reported having used a cane for the past few years; he got it on his own, and it was not prescribed by any of his doctors. (A.R. 243-45.)

Examination showed normal manual dexterity, grip strength, and ability to walk without limping, including walking heel-to-toe and on both heels and toes. Plaintiff could get on and off the examining table, lie down in the supine position, and sit up. There was mild flattening of the lumbar lordosis; the low back region was non-tender and without muscle tightness; straight leg raising was to eighty-five degrees bilaterally with hamstring tightness, and seated straight leg raising was negative bilaterally. Knees were non-tender without soft-tissue swelling or joint effusion on either side; the ligaments were intact, and McMurray's tests were negative bilaterally. There was mild sub-patellar crepitus with motion in both knees. Muscle strength was normal in both legs at 5/5, reflexes were 1+, and sensation was intact. Plaintiff lacked three inches of touching fingertips to the floor. (A.R. 244.)

Dr. Gurdin diagnosed degenerative lumbar disc disease with myofascitis, chondromalacia of both knees, and moderate obesity. (A.R. 245.) Improvement was expected with weight loss, physical therapy, and anti-inflammatory medication. Further, the cane was not medically indicated at that time. Hand and arm function were

intact. Plaintiff appeared capable of lifting and carrying forty
to fifty pounds on a one-time basis, thirty pounds occasionally
and fifteen pounds more frequently; standing up to two hours at a
time for up to six hours out of eight hours with routine breaks;
and sitting without restriction. Repetitive bending or working in
a bent-over position would probably aggravate the back pain.
(A.R. 245.)

      Malcolm F. Anderson, M.D., opined in October 2003 that a
radiological study of Plaintiff's lumbar spine showed minimal
degenerative changes; intervertebral disc spaces were well-
preserved, there was minimal osteophyte formation at the superior
end plate of L4 and L1, and no focal osseous abnormality was
seen. (A.R. 530, 252-53.) Plaintiff visited Dr. James G. Lindsay
for the first time that month and reported that he could do
nothing because of back pain that went to his knees; Plaintiff
drank beer to kill the pain, did not use medications, and used a
Jacuzzi for pain control; Naproxen and capsaicin cream did not
help. Plaintiff required a cane for ambulation. He was employed
as a truck driver at the time and reported that he had been
unable to work for the past three to four days. (A.R. 260-62,
251.)

      Dr. W. J. Vlymen, M.D., Ph.D., a radiologist, reported that
a study of Plaintiff's hip taken on November 24, 2003, reflected
no significant bony or soft tissue abnormalities. (A.R. 529.)
Plaintiff reported to Dr. Lindsay on November 24, 2003, pain of
6/10 at rest and worsening with movement. (A.R. 258-59.) He also
stated that the pain involved his left, lateral hip rather than
his back, but he believed it was his back on the advice of his

chiropractors. Dr. Lindsay observed that Plaintiff was alert and in no acute distress; the doctor noted the left hip showed slight asymmetry with "LATERAL ?SWELLING." Dr. Lindsay noted full range of motion, including flexion and extension, internal and external rotation, and abduction and adduction; there was no pain on passive movements, but there was pain on weight bearing. (A.R. 258.) At the end of November 2003, Dr. Lindsay prescribed Ibuprofen and Hydrocodone for pain. (A.R. 255.)

On December 5, 2003, Alfred Torre, M.D., a state agency medical consultant, opined that with respect to Plaintiff after the date last insured, Plaintiff could lift thirty pounds occasionally, twenty-five pounds frequently, and stand, walk, and sit about six hours in an eight-hour work day with no pushing or pulling with the lower extremities or knees, with only occasional climbing of ramps and stairs, stooping, kneeling, and crouching, and with no climbing of ladders, ropes, or scaffolds. (A.R. 271-78.)

In February 2004, Dr. Vlymen opined that a MRI study of the lumbar spine reflected well-maintained disc spaces, mild intervertebral disc desiccation at L3-4 and L4-5, unremarkable bone marrow signal, normal conus location, and unremarkable paraspinous, paravertebral, and prevertebral soft tissues. He reported finding at T12-L1 mild facet arthropathy bilaterally without significant disc protrusion or spinal stenosis; at L1-2, mild facet arthropathy bilaterally, broad-based disc bulge, and mild central canal stenosis; at L2-3 and L3-4, moderate sclerotic facet arthropathy bilaterally with broad-based disc bulges and small central disc protrusions causing moderate to severe central

canal stenosis; and at L5-S1, mild sclerotic facet arthropathy bilaterally with broad-based disc bulge without significant disc protrusion or spinal stenosis. (A.R. 527-28, 250-51.)

On March 5, 2004, state agency medical consultant Carmen E. Lopez, M.D., affirmed Dr. Torres's assessment of December 2003. (A.R. 277-79.)

Progress notes show that in June 2004, Plaintiff sought a refill of Ibuprofen, or "Motrin." (A.R. 348.) A treatment note from the summer of 2004 reflects that the two previous recordings of Plaintiff's vital signs had been in October and November 2003. (A.R. 347.)

Progress notes show that from August through October 2004, Plaintiff sought treatment for lower back and knee pain, including an appointment for surgery. In September 2004, an appointment for a neurosurgical consultation at the Palo Alto clinic was cancelled by Hongyan Zou because a MRI scan of the lumbar spine was reviewed and revealed mild stenosis and was "therefore no surgical target," and "not amenable to surgical intervention" at that time. It was recommended that in addition to x-rays, Plaintiff be treated conservatively with NSAID's, epidural injections, and a pain clinic. (A.R. 373-74.) In October, Plaintiff told Dr. Lindsay that he wanted to know how he could get money from the VA since he could not work any more. (A.R. 345-47.) A staff person advised Plaintiff not to give up because there were still more options, including job retraining. (A.R. 345.)

In early October 2004, Plaintiff was advised after a neurosurgery review that he was not a candidate for surgery but

should be evaluated for epidural steroids. (A.R. 371.) In mid-
October 2004, Plaintiff received the first of three planned
lumbar epidural steroid injections from Dr. Gatley for symptoms
of left sciatica and L2-3-4 central canal stenosis. (A.R. 342-
43.)

On January 5, 2005, studies revealed mild intervertebral
disc desiccation at L3-4 and L4-5 with disc spaces well
maintained; mild facet arthropathy bilaterally at T12-L1 with no
significant disc protrusion or spinal stenosis; mild facet
arthropathy bilaterally and broad-based disc bulge with mild
central canal stenosis at L1-2; moderate sclerotic facet
arthropathy bilaterally and broad-based disc bulge in association
with a small, central disc protrusion causing moderate to severe
central canal stenosis at both L2-3 and L3-4; moderate facet
arthropathy bilaterally with a broad-based central disc bulge
causing mild to moderate central canal stenosis at L4-5; mild
sclerotic facet arthropathy bilaterally with a broad-based disc
bulge with no significant disc protrusion or spinal stenosis at
L5-S1; and unremarkable paraspinous, paravertebral, and
prevertebral soft tissues. (A.R. 330-31.)

A complete physical examination was performed by Chi-Yan
Lee, M.D., at an Agent Orange evaluation on January 5, 2005.
Plaintiff was obese. Range of motion of the head and neck were
normal; there were no deformities of the spine, but there was
mild, paraspinal muscle spasm. There was no tenderness or
swelling of the knees or other joints of the upper or lower
extremities. There was no motor weakness or atrophy of the upper
or lower extremities, and Babinski's and Romberg's were negative.

Plaintiff reported that his pain in the low back and knees developed around 1970 and had gradually worsened. He had used a cane for walking in the past five to six years and used one at his Agent Orange evaluation. Surgery had not been recommended. The assessment was degenerative arthritis with lumbar spinal stenosis, hyperlipidemia, and obesity. (A.R. 334-42.)

In April 2005, during an examination relating to numbness and ringing in the right ear, it was noted by Dr. Santiago that Plaintiff had normal strength in all extremities, normal gait, normal sensation to light touch, and patellar deep tendon reflexes of 1+/4 bilaterally. (A.R. 319-20.) In June 2005, Plaintiff sought a second opinion concerning his spine; he was observed by a nurse practitioner using a cane to steady his gait. (A.R. 315.)

In July 2005, Dr. Santiago prescribed Hydrocodone and Ibuprofen for pain and Prozac for anxiety and depression, and he recommended further treatment for anxiety and possible help with chronic alcoholism involving consumption of a six-pack to a twelve-pack per night. (A.R. 364, 311-13.) Plaintiff complained of chronic back pain with radiculopathy and sought a second opinion after having been told earlier in Palo Alto that surgery was not an option. (A.R. 365.) A neurological consultation was requested. (A.R. 367.)

In August 2005, Plaintiff sought additional epidural injections for back pain. (A.R. 363.) Plaintiff was seen in the emergency room (ER) following a steroid injection for back pain and severe spasms that were accompanied by intact sensation, spontaneous ability to move all four extremities, and no numbness

or weakness. Plaintiff was able to walk on his own, although he reported chronic use of a cane at home. Demerol and Toradol were administered. Dr. Santiago started Gabapentin for pain and ordered a refill of Vicodin. Nursing staff observed Plaintiff transfer himself from a wheelchair to a bed with his cane. (A.R. 302-08, 364, 349-51.)

In October 2005, it was noted at the VA clinic that in August and September 2005, Plaintiff had been sent two letters to fill out a questionnaire and return it to set up an appointment for back school, but he did not respond to either letter. (A.R. 362.) In November 2005, he requested exercises for his back and help with coping. (A.R. 361, 298.)

On December 16, 2005, Dr. Vincente Santiago of the VA Central California Health Care System, examined Plaintiff, who complained of continuing back pain and had complained of tingling and numbness to the left leg for a month. Dr. Santiago found that Plaintiff was alert, oriented, and in no distress; there was no edema or swelling in the extremities or tenderness in the spine; and there was full range of motion in the peripheral joints and the spine. The assessment was back pain, to be treated with walking in place in the pool, physical therapy, and medications (Ibuprofen, Gabapentin, Hydrocodone, and Diphenhydramine HCL); Plaintiff was advised to drink less. It was noted that Plaintiff needed a TENS unit. (A.R. 293-98.) In a physician's report in support of NSC Pension completed by Dr. Santiago on December 16, 2005, Dr. Santiago stated that Plaintiff's spinal stenosis, hyperlipidemia, depression, and constant back pain, treated with Gabapentin, Vicodin, and Ibuprofen, kept him from working. (A.R.

1  495-96.)

2      In February 2006, a TENS unit was issued to Plaintiff on Dr.
3  Santiago's order. (A.R. 358-61.) Plaintiff requested a physical
4  therapy class, and he was instructed in exercise by a primary
5  care nurse. (A.R. 290-92.)

6      On March 21, 2006, Dr. Santiago opined that Plaintiff's
7  capacity to lift, carry, stand, and walk were affected by his
8  impairments, but it could not be determined how much because Dr.
9  Santiago said he was not an occupational health physician;
10 however, Plaintiff had chronic back pain without lifting
11 anything. Sitting, reaching, feeling, handling, pushing, pulling,
12 seeing, hearing, and speaking were affected, and there were
13 environmental restrictions with respect to heights and moving
14 machinery. However, the nature of the effects on physical
15 functions and the medical findings that supported the assessment
16 were not stated, other than an assessment that Plaintiff was
17 unable to lift, bend, stand, or sit for "long periods" and had
18 chronic, life-long, degenerative disc disease based on his
19 symptoms and the MRI dated February 10, 2004. For more specific
20 testing, Dr. Santiago recommended an occupational health
21 physician. (A.R. 376-78.)

22     On April 11, 2006, x-rays of the lumbar spine were taken and
23 compared with previous studies from October 2003. The
24 intervertebral disc spaces were well-preserved. There was minimal
25 osteophyte formation at the superior end plates of L1 and L4, and
26 no focal osseous abnormality. The impression was no interval
27 change. (A.R. 526.)

28     In April 2006, it was noted that Plaintiff used a cane for

ambulating. (A.R. 489.) In June 2006, it was noted that Plaintiff walked with a cane during a neurology assessment. (A.R. 473.)

Dr. Vlymen opined that a MRI study of Plaintiff's lumbar spine taken on May 17, 2006, reflected mild disc space narrowing at L3/4, mild degenerative central canal spinal stenosis at L1/2, moderate degenerative central canal stenosis at L2/3, and severe central canal degenerative spinal stenosis in conjunction with a large central disc protrusion/herniation at L3/4.  (A.R. 415.)

A MRI study of the cervical spine from June 2006 showed mild to moderate disc degenerative changes at C4-C5 and C5-C6. (A.R. 523.) Flexion/extension films of the lumbar spine in June 2006 showed no significant abnormalities. (A.R. 524.)

On July 7, 2006, a rehabilitation equipment request for a walking cane was made, and it was issued from stock on August 15, 2006. (A.R. 433-34.) A replacement was issued on September 14, 2006. (A.R. 434.)

On July 19, 2006, Plaintiff underwent neurosurgery for lumbar stenosis, including lumbar decompression L2-4 laminectomies and foraminotomies with L2/3 discectomy. (A.R. 380.) At the time of the surgery, an MRI revealed mild disc space narrowing at L3/4, mild degenerative central canal spinal stenosis at L1/2, moderate degenerative central canal stenosis at L2/3, and severe central canal degenerative spinal stenosis in conjunction with a large central disc protrusion/herniation at L3/4. (A.R. 386, 415, 525.) An x-ray showed no significant abnormalities on flexion-extension views. A MRI study of the cervical spine from June 2006 also showed degenerative changes with bulging of the disc with a small lateral protrusion and

narrowing of the bilateral recess in C5-C6, with mild to moderate spinal canal stenosis. (A.R. 413.) The impression of Plaintiff's surgeon was L3-4 stenosis with neurogenic claudication; Plaintiff had recently started Methadone. (A.R. 385-88.)

After surgery, Plaintiff was discharged home on July 20, 2006, with instructions to avoid heavy lifting, bending, or twisting, and with medications (Vicodin, Valium, and "dss" as well as resumption of "home meds"). (A.R. 30-81.)

In August 2006, Plaintiff reported to a neurosurgical resident and the chief of neurosurgery that he was doing well, and Plaintiff exhibited clean and intact incision, no fever, full strength at 5/5 bilaterally in the upper and lower extremities, ability to sit in a chair with no apparent distress, and intact sensation throughout; he expressed a desire to resume exercise. (A.R. 382-83.) He reported that the radiating pain that he had experienced in the lower extremities was gone, but his chronic low back pain continued, and he could stand only ten to fifteen minutes before the pain caused him to have to sit down. (A.R. 382.) A shower chair, cane, and reacher were ordered on August 15, 2006; Plaintiff reported that his cane broke, and he requested a replacement. (A.R. 426-28.) In September he reported that his pain was more manageable, and his need for medication was reduced. (A.R. 432.)

V. Expert Opinions

Plaintiff mounts several challenges to the ALJ's finding that Plaintiff was not disabled before the cut-off date of January 1, 2006. Plaintiff argues that medical evidence does not support the ALJ's finding, contending specifically that the ALJ

failed to state specific, legitimate reasons for discounting the opinion of treating physician Dr. Santiago and the only reasonable inferences to be drawn therefrom, namely, that as of February 2004, when the MRI study showed moderate to severe stenosis, Plaintiff was dysfunctional to the extent of being disabled.

A. Legal Standards

The standards for evaluating treating source's opinions are as follows:

> By rule, the Social Security Administration favors the opinion of a treating physician over non-treating physicians. See 20 C.F.R. § 404.1527. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [it will be given] controlling weight." Id. § 404.1527(d)(2). If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the Administration considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician; and the "nature and extent of the treatment relationship" between the patient and the treating physician. Id. § 404.1527(d)(2)(i)-(ii). Generally, the opinions of examining physicians are afforded more weight than those of non-examining physicians, and the opinions of examining non-treating physicians are afforded less weight than those of treating physicians. Id. § 404.1527(d)(1)-(2). Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the Administration's "disability programs and their evidentiary requirements" and the degree of his or

her familiarity with other information in the case record. Id. § 404.1527(d)(3)-(6).

Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007).

With respect to proceedings under Title XVI, the Court notes that an identical regulation has been promulgated. See, 20 C.F.R. § 416.927.

As to the legal sufficiency of the ALJ's reasoning, the governing principles have been recently restated:

> The opinions of treating doctors should be given more weight than the opinions of doctors who do not treat the claimant. Lester [v. Chater, 81 F.3d 821, 830 (9th Cir.1995) (as amended).] Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record. Id. (internal quotation marks omitted). Even if the treating doctor's opinion is contradicted by another doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id. at 830, quoting Murray v. Heckler, 722 F.2d 499, 502 (9th Cir.1983). This can be done by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings. Magallanes [v. Bowen, 881 F.2d 747, 751 (9th Cir.1989).] The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct. Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir.1988). Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.1998); accord Thomas, 278 F.3d at 957; Lester, 81 F.3d at 830-31.

Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007).

B. Analysis

Here, the ALJ reviewed the medical evidence of record, noting the mild and essentially normal findings and opinion of Dr. Gurdin in 2003 and Plaintiff's having maintained employment through November 2003; the degenerative changes with moderate to severe central canal stenosis at L2-4 noted in the MRI study of

February 2004; the opinion of the neurosurgeon in September 2004 that the findings from the MRI of February 2004 did not warrant back surgery; continued pain and occasional observable muscle spasms in the low back through 2005; the prescription of a cane and TENS unit for home use in January 2006; the diagnosis of claudication secondary to spinal stenosis in June 2006; and Plaintiff's discectomy and laminectomy at L3-4 in July 2006. (A.R. 21-22.) With respect to Dr. Santiago's opinion of March 2006, the ALJ stated:

> In March 2006 Dr. V. Santiago partially assessed
> the claimant's functional capacity, stating that his
> ability to lift, carry, stand, walk, and sit
> were affected by his impairments, but not to what
> degree (Exhibit 11F).

(A.R. 22.)

> With respect to the opinion evidence, the ALJ stated:

> In determining the claimant's residual functional capacity
> for the period from September 2003 through
> January 1, 2006, I give very substantial weight to
> Dr. Gurdin's October 2003 consultative evaluation
> and to his opinion that the claimant could perform a
> range of exertion between light and medium (Exhibit 7F).
> The initial VA examination in October 2003 echoes
> Dr. Gurdin's findings (Exhibit 8F, pp. 16-17).
> Weight is given to the state agency determination
> that the claimant could perform light exertion
> with preclusions on stooping and crouching (Exhibit 9F)[.]
> For the period from January 1, 2006 to the present, I
> give substantial weight to the VA records, which
> show that the claimant's back pain worsened gradually
> and that by January 2006 he was prescribed a cane
> and TENS unit (Exhibit 10F, pp. 73, 76). These
> factors support the conclusion that the claimant
> was disabled no earlier than January 1, 2006.

(A.R. 22.)

The ALJ also reasoned that although Plaintiff's impairment could reasonably have been expected to produce some symptoms, Plaintiff's subjective complaints concerning the intensity,

1  persistence, and limiting effects of the symptoms were not
2  entirely credible. (A.R. 23.) Plaintiff's claim of pain in the
3  eighties and nineties to the extent that he considered suicide
4  was inconsistent with his having delayed seeking treatment
5  consistent with back pain until 2003, a time when he had just
6  filed for disability benefits. Further, the medical record
7  suggested that Plaintiff's early symptoms resolved with
8  chiropractic treatments; narcotic pain medication was not
9  prescribed until February 2004. (A.R. 23.) A cane was prescribed
10 no earlier than January 2006. (Id.) These factors supported the
11 conclusion that from September 2003 through January 1, 2006,
12 Plaintiff was able to perform light exertion with postural
13 limitations. Further, Plaintiff's credibility about his symptoms
14 was lessened by his continued work activity after he applied for
15 disability benefits. (A.R. 23.)

16      Contrary to Plaintiff's assertions, the ALJ expressly
17 addressed Dr. Santiago's opinion. The record supports the ALJ's
18 observation that the opinion was uncertain with respect to the
19 extent of any functional limitations resulting from Plaintiff's
20 impairments. Further, the reasoning was specific and legitimate.
21 A conclusional opinion that is unsubstantiated by relevant
22 medical documentation may be rejected. See Johnson v. Shalala, 60
23 F.3d 1428, 1432-33 (9th Cir. 1995). Even where an expert's report
24 identifies characteristics that might limit a claimant's ability
25 to perform work on a sustained basis, if the report fails to
26 explain how such characteristics preclude work activity in the
27 claimant's case, it is appropriate and adequate for an ALJ to
28 determine that the level of impairment stated is unreasonable in

light of the symptoms and other evidence in the record, and to set forth that analysis. <u>See</u> <u>Morgan v. Commissioner of Social Security</u> 169 F.3d 595, 601 (9th Cir. 1999). The absence of specific limitations in Dr. Santiago's opinion of March 2006 legitimately affected the weight that could be put on it.

Plaintiff points to the fact that Dr. Santiago's opinion in 2006 was based on findings that were evident in a MRI study of February 2004; thus, one must infer that Plaintiff was disabled as of February 2004.

It is true that in the form he filled out in March 2006, Dr. Santiago referred to the 2004 test. In the portion of the form requesting the medical findings that supported Dr. Santiago's assessment, Dr. Santiago stated:

> Mr. Lopez has degenerative disc disease based on his symptoms and MRI dated 2/10/04. This is a chronic, lifelong problem. He is under medication (pain meds). For specific testimony, I suggest that Mr. Lopez see an Occupational Health Physician.

(A.R. 378.)

However, with respect to the MRI study of February 2004, the ALJ specifically relied on the opinion of the surgical specialist who in September 2004 concluded that surgical treatment was not appropriate for those findings. (A.R. 22.) Reliance on the opinion of a specialist was legitimate. More weight is generally given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist. <u>See</u> <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1203 n. 2 (9th Cir. 2001); 20 C.F.R. §§ 416.927(d)(5), 404.1527(d)(5).

Implicit in Plaintiff's argument is an assertion that the

ALJ arbitrarily or "simply pick[ed]" an onset date. (Pltf.'s op.
brf. p. 8.) After review of the record and the ALJ's decision,
this Court rejects such an assertion. The ALJ reviewed the
medical evidence as a whole and determined the consistency of the
various expert opinions with the overall record. The ALJ relied
on the chronological development of the opinions concerning
Plaintiff's functionality, noting the earlier mild opinions,
Plaintiff's continuing symptoms, and Dr. Santiago's opinion in
December 2005, culminating with the employment of a cane and TENS
unit in January 2006 and surgery later that year. (A.R. 22.) The
ALJ considered Plaintiff's symptoms and the treatment he received
as well as the opinion evidence, and he set forth his analysis.
The record supported his characterization of the medical evidence
as reflecting mild findings and recommendations for conservative
treatment until continued symptoms developed to a point that work
was precluded in the winter of 2005 through 2006. (A.R. 22.)

     Plaintiff attacks the sufficiency of the evidence to support
the ALJ's reliance on the prescription of a cane and TENS unit in
January 2006. The record reflects that on January 13, 2006, a
single point cane ("SPC") (A.R. 358) was issued to Plaintiff by a
VA physical therapist, and a TENS unit was provided to Plaintiff
on a trial basis (A.R. 361, 358-61). Plaintiff does not point to
evidence that a cane or TENS unit was prescribed at an earlier
time. However, Plaintiff relies on the fact that Dr. Santiago
stated that Plaintiff needed a TENS unit several weeks earlier on
December 16, 2005. (A.R. 295.) He also points to Plaintiff's use
of a cane much earlier than January 2006. The record does show
that Plaintiff ambulated with a cane in June 2005 and October

2004, and he reported that he had used a cane for five or six years preceding January 2005. (A.R. 315, 356, 334-35.) Nevertheless, in considering the chronological continuum of Plaintiff's alleged symptoms in connection with determining Plaintiff's functionality, the ALJ had discounted Plaintiff's credibility with respect to the intensity and frequency of his symptoms; he had also noted that Plaintiff sought treatment for his back pain at the time he applied for disability benefits, and he continued to work after the time he alleged that he had been disabled. It was reasonable for the ALJ to find significant the date on which Plaintiff actually began using the appliances prescribed by his treating physician, and the ALJ's reasonable analysis of the evidence will be upheld by this Court.

In summary, the Court concludes in accordance with the foregoing analysis that the ALJ's decision was made according to correct legal standards, contained legally sufficient reasons, and was supported by substantial evidence.

VI. <u>Necessity for an Expert to Determine the Date of the Onset of Disability</u>

Plaintiff argues that the ALJ failed to comply with Social Security Ruling 83-20, which may require consultation with a medical expert concerning the date of onset of a disabling impairment.

When a claimant proceeding pursuant to Title II has a period of eligibility for disability benefits that expires on a specific date, it is the burden of the claimant to establish that the claimant was either permanently disabled or subject to a condition which became so severe as to disable the claimant prior

to the date on which his or her disability insured status expired. Sam v. Astrue, 550 F.3d 808, 810-11 (9th Cir. 2008). With respect to SSI, because SSI payments are made beginning with the date of application, the onset date in an SSI case is ordinarily established as of the date of filing, provided that the claimant was disabled on that date. Soc. Sec. Ruling 83-20. Exceptions are where the evidence shows that the onset date was subsequent to the date of filing, or where there is a problem requiring ascertainment of duration. Id. It is the Plaintiff's burden to prove the onset date of disability. Morgan v. Sullivan, 945 F.2d 1079, 1080 (9th Cir. 1991) (disability insurance benefits).

Social Security Ruling 83-20 states the policy and describes the relevant evidence to be considered when establishing the onset date of disability under Titles II and XVI of the Social Security Act. Soc. Sec. Ruling 83-20, p. 1. The onset date of disability is the first day a claimant is disabled as defined in the Act and the regulations. Id. The determination of the onset date of disability is undertaken "[i]n addition to" determining that a claimant is disabled. Id.

Here, the ALJ determined that Plaintiff was not disabled from the alleged onset date of September 15, 1999, through January 1, 2006, but he became disabled on January 1, 2006, and continued to be disabled through the date of decision. (A.R. 24.) In these circumstances, Soc. Sec. Ruling 83-20 does not require a medical expert. Sam v. Astrue, 550 F.3d 808, 809-11. This is because where an ALJ finds that a claimant was not disabled at any time through the date of the decision, the question of when the claimant became disabled does not arise, and the procedures

28

1  prescribed in Soc. Sec. Ruling 83-20 do not apply. <u>Id.</u> at 810.

2      Here, the Appeals Council did not remand the matter to the

3  ALJ to determine <u>when</u> before January 1, 2006, Plaintiff became

4  disabled; rather, it directed the ALJ to determine <u>whether</u> <u>or</u> <u>not</u>

5  Plaintiff was disabled on the application during the period

6  before that date. (A.R. 27-28.) The Appeals Council's direction

7  on remand to the ALJ was to "take any further action needed to

8  complete the administrative record and issue a new decision on

9  the issue of disability <u>before</u> <u>January 1, 2006.</u>" (Emphasis

10 added.) (A.R. 28.) Contrary to the assumption underlying

11 Plaintiff's contention, the ALJ was not initially directed or

12 authorized to determine an onset date of an established

13 disability.

14     Further, although in the course of the sequential analysis,

15 the ALJ recited the finding that Plaintiff was disabled on and

16 after January 1, 2006 (A.R. 24), the ALJ had expressly noted with

17 respect to the previous ALJ's decision that the Appeals Council

18 "did not vacate that part of the decision which found that the

19 claimant was disabled on and after January 1, 2006." (A.R. 18.)

20 Because the ALJ found that Plaintiff had not demonstrated that he

21 was disabled before January 1, 2006, it was not necessary for the

22 ALJ to call upon a vocational expert to aid in the determination

23 of any date on which a disability commenced, and Social Security

24 Ruling 83-20 did not apply.

25     With respect to Plaintiff's contention that vocational

26 expert testimony was necessary at step five to determine the

27 impact of Plaintiff's use of a cane on the occupational base, the

28 Court notes that the ALJ concluded that Plaintiff retained the

RFC to perform limited light work with occasional stooping and crouching through December 31, 2005. (A.R. 21.) The record establishes that a cane was prescribed by his doctor in mid-December 2005 and was documented as provided to Plaintiff in mid-January 2006. It does not appear that Plaintiff has established that before January 1, 2006, he suffered functional limitations from a required hand-held assistive device that was medically documented as provided in Social Security Ruling 96-9p (p. 6).

VII. <u>Disposition</u>

Based on the foregoing, the Court concludes that the ALJ's decision was supported by substantial evidence in the record as a whole and was based on the application of correct legal standards.

Accordingly, the Court AFFIRMS the administrative decision of the Defendant Commissioner of Social Security and DENIES Plaintiff's Social Security complaint.

The Clerk of the Court IS DIRECTED to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Richard R. Lopez.


IT IS SO ORDERED.

**Dated:    April 1, 2010**                          **/s/ Sandra M. Snyder**
                                         UNITED STATES MAGISTRATE JUDGE